UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

JUDGE CASTEL

NORMAN D. LIFTON CO., INC.,

Civil Action No. 07 CV 3134

Plaintiff,

**COMPLAINT**

-against-

MERCIER WOOD FLOORING, INC. and
BAYARD SALES CORP.,

Defendants.

------------------------------------------------------------x



Plaintiff Norman D. Lifton Co., Inc. ("NDL"), by its attorneys, Jaffe & Asher, LLP, for its Complaint herein against defendants Mercier Wood Flooring, Inc. ("Mercier") and Bayard Sales Corp. ("Bayard"), alleges as follows:

### NATURE OF THE ACTION

1. This action is brought by plaintiff NDL, a distributor of wood flooring (and other) products. The action is brought against a wood flooring manufacturer (defendant Mercier) and another distributor of wood flooring (defendant Bayard) who conspired against NDL in order to prevent it from selling at low prices. Defendants engaged in a resale price maintenance conspiracy, pursuant to which NDL was ultimately terminated as a distributor of Mercier products because it refused to raise its prices.

2. NDL brings this action for unlawful restraint of trade and illegal resale price maintenance under 15 U.S.C. § 1 (the Sherman Act), the New York General Business Law § 340 (the Donnelly Act), the New York General Business Law § 349 (New York Deceptive Trade Practices Act) and the common law. NDL seeks damages sustained as a result of defendants'

unlawful conduct in an amount to be proven at trial, but believed to be in excess of $1,000,000, as well as treble damages, punitive damages and attorneys' fees.

## JURISDICTION AND VENUE

3. This court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1337 in that it involves a federal question under the antitrust laws of the United States, particularly 15 U.S.C. § 1 (the Sherman Act). This Court has pendent jurisdiction over NDL's state statutory claims and its common law claims because such claims arise from the same or closely related conduct of defendants.

4. Moreover, this court also has subject matter jurisdiction over this matter pursuant to 29 U.S.C. § 1332 because there exists complete diversity between the parties and the amount in controversy exceeds $75,000.

5. This Court has personal jurisdiction over defendants Mercier and Bayard because: (i) defendants have transacted business in New York; (ii) defendants regularly do or solicit business in New York; and (iii) defendants intentionally acted in such a way as to cause injury to plaintiff NDL in New York.

6. Venue is proper in this district by virtue of: (a) 28 U.S.C. § 1391(b), because this is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred; (b) 28 U.S.C. § 1391(c), because each of the defendants is subject to personal jurisdiction within the district; (c) 28 U.S.C. § 1391(d) as to defendant Mercier, because it is an alien corporation organized and residing in the province of Quebec, Canada; and (d) 15 U.S.C. § 22, because each of the defendants has transacted business in this district.

**THE PARTIES**

7. Plaintiff NDL is a corporation organized and existing under the laws of the State of New York, whose principal place of business is located at 315 E. 3rd Street, Mt. Vernon, New York 10553.

8. NDL is engaged in the business of selling and distributing wood flooring products (and other flooring products) to retail floor dealers, contractors and others.

9. Upon information and belief, defendant Mercier is a corporation organized and existing under the laws of the province of Quebec, Canada, whose principal place of business is located at 330 rue des Entrepreneurs, Montmagny, Quebec, Canada, G5V 4T1.

10. Upon information and belief, defendant Bayard is a corporation organized under the laws of the state of Pennsylvania, whose principal place of business is located at 3300 Richmond St., Philadelphia, Pennsylvania 19134.

**ALLEGATIONS COMMON TO ALL CLAIMS**

A. **NDL's Introduction of the Mercier Products**

11. Prior to the 1990s, wood flooring products were distributed and sold mainly through specialized wood retailers and wholesalers to installers and builders.

12. In recent years, full service distributors, like plaintiff NDL, began distributing wood flooring to retail stores, which in turn offer the product to builders and other retail customers.

13. Upon information and belief, until 2002, Mercier, a Canadian manufacturer of wood flooring, had failed to make any substantial inroads into the United States market. However, a larger Canadian firm, Boa-Franc, G. P., had succeeded in introducing its product, called "Mirage," into the United States market.

14. In 2002, NDL began distributing Mercier's wood flooring in New York and Connecticut. NDL did not enter into any distribution agreement contract or other arrangements that restricted the territories in which NDL could distribute Mercier products, or that limited the price at which its products could be sold.

15. In 2004, NDL and Mercier developed a unique approach to the distribution of wood flooring products, which proved to be highly successful, and which significantly furthered the introduction of Mercier to the United States market, especially the New York metropolitan marketplace of almost 30 million people within 130 miles of Manhattan. Under this approach, NDL distributed approximately two dozen Mercier products, all priced somewhat below prices offered for Mirage, the market leader. Rather than selling each Mercier product at a different price, NDL offered one of two prices for each of the products. All of the products were carried in NDL's inventory, and could be delivered overnight. This program came to be called the "quick-ship" program.

16. NDL made significant investments to develop the Mercier business, including: (a) the purchase of sales racks, which were placed at retail outlets; (b) the placement of approximately 300 Mercier product displays at retail outlets; (c) the purchase of thousands of hand board displays for Mercier products; (d) identification and development of relationships with retail stores which would carry Mercier products; and (d) the commitment of NDL sales personnel to Mercier products, who were compensated by salary and commission for their sales of such products.

17. The cost to NDL of developing the Mercier market was at least $475,000.

4

18. This "quick-ship" program was an immediate success. Beginning in 2004, NDL sold Mercier products on a "quick-ship" basis throughout its entire marketing area, including southern New York, New Jersey, eastern Pennsylvania and Connecticut.

19. From January 2004 to June of 2004, NDL's sales of Mercier products rose from approximately $9,000 a month to $70,000 a month. During the second half of 2004, NDL's sales of Mercier products rose to an average of nearly $100,000 per month; during the first half of 2005, those sales rose on average to $125,000 per month; and during the third quarter of 2005, those sales rose on average to $127,000 per month.

B. **Mercier and Bayard Enter into an Illegal Price Fixing Conspiracy**

20. Upon information and belief, in or about mid-2005, Mercier entered into discussions with another flooring distributor, defendant Bayard ("Bayard"), concerning the distribution of Mercier wood flooring in the United States.

21. Bayard is substantially larger than NDL, and distributes products over a larger geographical territory. Upon information and belief, Bayard had lost its wood flooring line, called "Hartco," which was manufactured by Armstrong World Industries, Inc. For this reason, Bayard was seeking a new supplier.

22. Upon information and belief, Mercier was so anxious to obtain Bayard as a distributor in the United States, that it was willing to enter into an illegal minimum resale price agreement in order to so.

23. Upon information and belief, in or about mid-2005, Mercier and Bayard entered into an illegal minimum resale price agreement, in violation of 15 U.S.C. § 1 (Sherman Act) and New York General Business Law § 340 (the Donnelly Act). This agreement was unlawful in

that the purpose and effect of the agreement was to restrain trade, deceive customers, fix retail prices and limit the flow of goods in commerce.

24. In particular, upon information and belief, Bayard and Mercier agreed that Mercier would impose minimum resale prices upon its United States distributors, including plaintiff NDL, so that both Bayard and NDL would resell Mercier products at no less than certain minimum prices throughout the United States.

## C. Mercier Advises NDL of the New Pricing Scheme

25. Upon information and belief, Mercier, pursuant to its illegal price fixing agreement with Bayard, sought to impose minimum resale prices upon NDL in the latter half of 2005.

26. On September 26, 2005, NDL and Mercier held a meeting at NDL's offices in Mount Vernon, New York, attended, inter alia, by Ronald Lifton ("Lifton"), the President of NDL, Nicholas Romanelli ("Romanelli"), NDL's Vice President of Sales, Jean-Mare Landry ("Landry"), Mercier's General Manager, and Roger Guay ("Guay"), Mercier's Director for Domestic Sales and Marketing and for Export Sales and Marketing, and Wade Bondrowski ("Bondrowski"), a Mercier salesperson. NDL had expected congratulations for its enormous success in introducing Mercier products to the United States market. Instead, NDL was informed that a new distributor, Bayard, would be competing within NDL's sales territories. Mercier advised that Bayard would begin distributing Mercier products on or about November 1, 2005.

27. Upon information and belief, Bayard began distributing Mercier products on or about November 1, 2005.

6

28. Thereafter, on December 8, 2005, at Mercier's offices in Montmagny, Canada, Lifton and Romanelli, from NDL, met with Landry and Guay, from Mercier.

29. At the meeting, Mercier representatives informed NDL that Bayard, Mercier's new distributor, could not operate economically if it discounted at the same level as NDL. One of the Mercier representatives said, in words or substance, "Can NDL only operate as a price cutter?"

30. Mercier informed NDL that in the future, NDL would have to follow a new and higher resale pricing formula, with a 25% margin over list prices set by Mercier. NDL was also told to immediately discontinue its low-price and highly successful "quick-ship" program.

31. Moreover, Mercier advised NDL that it would no longer be allowed to sell Mercier products in New Jersey, Pennsylvania and certain counties in Connecticut.

32. Upon information and belief, Mercier placed these restrictions on NDL in order to facilitate and carry out its illegal conspiracy with Bayard with respect to maintaining minimum resale prices for Mercier products within the United States.

**D.    Mercier Demands Compliance with the Resale Price Maintenance Program**

33. NDL knew that the discontinuance of the "quick-ship" program and the imposition of higher prices would have a highly deleterious effect on its business. For this reason, NDL resisted Mercier's attempts to impose higher resale prices.

34. On December 19, 2005, Lifton e-mailed Guay, stating that NDL was requesting 120 additional days to continue selling in the territories from which it would eventually be excluded.

35. In response, on December 22, 2005, Guay stated that he wanted NDL to redouble its efforts in the territory assigned to NDL, but that Mercier would permit NDL to sell in the

excluded territories only until February 1, 2006. He confirmed what had been said by Mercier at its meeting with NDL about the imposition of minimum retail prices:

> Also, as discussed in Montmagny earlier this month, Mercier has a recommended dealer price list that offers your organization the opportunity to sell our products at a 25% margin. This is a great tool to help you sell Mercier products in the context of optimal profitability! We encourage you to take advantage of this opportunity immediately to help make your Mercier business much better for you financially! [Emphasis added.]

36. Following the December 8, 2005 meeting, NDL raised its prices officially, but continued nevertheless to offer its customers substantial discounts.

37. Mercier again demanded that NDL stop selling at discount prices. Thus, on January 19, 2006, Bondrowski, the Mercier salesperson, sent an e-mail to Lifton as follows:

> Ronald, it was both parties that established, in order for all of us to progress forward that you were going to elevate your profit margins in your trading area. Your price increase had taken effect in January but we have seen no movement in your price sheets and or quotes, we will not tolerate or except [accept] low margin selling in the future. Our goal is to make all of our partners PROFITABLE, and there is no reason why we should be selling the best hardwood produced at these margins. I anxiously await your reply and your plan on how we are going to shift the Lifton Co. forward. [Emphasis added.]

38. NDL did not respond to the e-mail because it had no intention of halting the discounts that it had been offering to retailers off the "official" price list.

39. On February 4, 2006, Guay e-mailed Lifton and again demanded that NDL raise its prices and implement the new pricing discussed at the December 2005 meeting. On February 10, 2005, Lifton responded, in pertinent part:

> I have just now received your e-mail of Feb. 04 regarding selling profit margins. Please do remember my e-mail of early January stating that my inventory level (particularly of stained items), was to[o] high to drastically raise prices at the slowest time of the year. I have also received your voice mail of last evening on the same subject.

> I have just now received your latest cost list in the mail. I will
> prepare an NDL price list using your suggested dealer pricing. It
> will be in effect by end next week.

40. On February 21, 2006, Lifton (in response to an e-mail from Guay) advised Guay that NDL had "pulled" the special price list for items on the quick ship program, and was only offering the "suggested dealer price list USA" for Mercier products.

41. However, because Lifton had $400,000 in Mercier inventory, which it needed to sell, it continued to sell at prices lower than the "official" price list.

42. Mercier took a number of steps to punish NDL for its refusal to raise prices and its failure to accept the resale price maintenance program agreed to by Mercier and Bayard, including the following: (a) Mercier, in a break from past practice, did not schedule meetings with NDL at two trade shows, held in February 2006 and April 2006; (b) Mercier did not advise NDL of a new custom color program that it was unveiling during this time period; (c) when NDL sought a price quote for a customer, Mercier took one week to respond (instead of the usual 24 hours) and the customer was lost; (d) Bondrowski approached an NDL customer in NDL's remaining sales territory (Monmouth County), and advised the customer that NDL was no longer a Mercier distributor; and (e) Mercier made a great fuss over some minor invoicing problems, all or most of which were Mercier's fault.

43. The culmination of Mercier's program to enforce its illegal price maintenance agreement came on July 14, 2006, when Mercier sent NDL a notice terminating its distribution relationship with Mercier.

E. **Damages**

44. As a result of defendants' wrongful conduct, NDL was unable to continue selling Mercier's products, and lost the net profits that it would have earned on the sale of such products.

9

45. Moreover, NDL had made a substantial investment in supporting the Mercier line of products in the United States, which exceeded the sum of $475,000, the value of which was destroyed by Mercier's wrongful conduct.

46. Finally, NDL's success with the Mercier line of products had been very important to NDL's overall business. Having the Mercier line enhanced NDL's ability to attract customers who purchased not only the Mercier line but also less specialized products from NDL.

47. Defendants' wrongful conduct caused NDL to lose sales of other products, and damaged its goodwill in the marketplace.

48. As a result, the value of NDL's business as a going concern was substantially diminished.

49. All together, Lifton sustained no less than $1 million in damages.

### FIRST CAUSE OF ACTION BY PLAINTIFF NDL AGAINST DEFENDANTS MERCIER AND BAYARD
(Violation of Sherman Act 15 U.S.C. § 1)

50. Plaintiff NDL repeats and realleges each and every allegation contained in paragraphs 1 through 49 of this complaint.

51. Upon information and belief, defendants Mercier and Bayard entered into an illegal minimum resale price maintenance scheme, pursuant to which they illegally agreed to restrict the prices at which distributors could sell Mercier products in the United States.

52. In order to enforce this illegal price fixing agreement, Mercier substantially undermined NDL's ability to do business, and ultimately terminated NDL as a distributor.

53. Defendants' Mercier and Bayard's agreement to artificially maintaining minimum resale prices constituted an unlawful restraint of trade in violation of the Sherman Act, 15 U.S.C.

§ 1 et seq. Section 1 makes illegal "[e]very contract, combination..., or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1.

54. Defendants' conduct constitutes a minimum resale price maintenance scheme that is per se unlawful.

55. As a result of the wrongful actions of defendants, plaintiff NDL has sustained damages in an amount to be proven at trial, but in no event less than one million dollars ($1,000,000.00), trebled pursuant to statute.

### SECOND CAUSE OF ACTION BY PLAINTIFF NDL AGAINST DEFENDANTS MERCIER AND BAYARD
(Violation of Donnelly Act N.Y. General Business Law §§ 340)

56. Plaintiff NDL repeats and realleges each and every allegation contained in paragraphs 1 through 55 of this complaint.

57. Upon information and belief, defendants Mercier and Bayard entered into an illegal minimum resale price maintenance scheme, pursuant to which they agreed to restrict the prices at which distributors could sell Mercier products in the United States.

58. In order to enforce this illegal price fixing agreement, Mercier substantially undermined NDL's ability to do business, and ultimately terminated NDL as a distributor.

59. Defendants' agreement to artificially maintain minimum resale prices constituted a contract, agreement, arrangement or combination whereby competition or the free exercise of activity in the conduct of the business or trade of plaintiff NDL was unlawfully restrained, in violation of N.Y. Gen. Bus. Law § 340.

60. Defendants' conduct constitutes a minimum resale price maintenance scheme that is per se unlawful.

11

61. As a result of the wrongful actions of defendants, plaintiff NDL has sustained damages in an amount to be proven at trial, but in no event less than one million dollars ($1,000,000.00), trebled pursuant to statute.

### THIRD CAUSE OF ACTION BY PLAINTIFF NDL AGAINST DEFENDANTS MERCIER AND BAYARD
(Violation of N.Y. General Business Law § 349)

62. Plaintiff NDL repeats and realleges each and every allegation contained in paragraphs 1 through 61 of this complaint.

63. N.Y. Gen. Bus. Law § 349 prohibits deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in the State of New York and make such acts and practices unlawful.

64. Defendants have engaged in deceptive acts and practices in violation of N.Y. Gen. Bus. Law § 349 by their wrongful agreement to enforce minimum resale price restraints upon defendant NDL.

65. The aforesaid actions have not only caused injury to plaintiff NDL, but have caused harm to the public at large. In essence, defendant Mercier, a manufacturer of wood flooring products, has conspired with a major United States distributor, Bayard, to set minimum resale prices to the consuming public for the purchase of Mercier products. This practice, which defendants have deceitfully failed to disclose, has the effect of victimizing the ultimate consumers of Mercier products by depriving them of a competitive market for Mercier products.

66. As a result of the aforesaid violations of N.Y. Gen. Bus. Law § 349, plaintiff NDL has sustained damages in an amount to be proven at trial, but in no event less than one million dollars ($1,000,000.00), trebled pursuant to statute.

## FOURTH CAUSE OF ACTION BY
## PLAINTIFF NDL AGAINST DEFENDANT BAYARD
(Tortious Interference with Contract and Prospective Contractual Relations)

67. Plaintiff NDL repeats and realleges each and every allegation contained in paragraphs 1 through 66 of this complaint.

68. Upon information and belief, defendant Bayard was fully knowledgeable that: (1) Mercier had entered into contractual agreements with NDL, pursuant to which Mercier was supplying NDL with products for resale in the United States markets; and/or (2) NDL and Mercier had an established business relationship pursuant to which Mercier was distributing its products within the territories served by NDL within the United States.

69. Upon information and belief, in pursuit of its goal of illegally and wrongfully maximizing its profits, ridding itself of a competitor, and replacing NDL as distributor within territories served by NDL, defendant Bayard directly and indirectly, unfairly and maliciously interfered with NDL's existing contracts and/or prospective business relationships with Mercier, by, among other things: (a) entering into an illegal minimum price maintenance agreement with Mercier, as was heretofore described; and (b) inducing Mercier to terminate NDL as a distributor of Mercier products. Bayard had no legitimate justification for its actions.

70. Consequently, defendant Bayard has destroyed the business relationship between NDL and Mercier, causing NDL substantial loss of revenue and profits, causing NDL to lose its investment in the Mercier business and causing NDL to lose reputation and goodwill in the industry.

71. As a result of the wrongful conduct of defendant Bayard, NDL has been damaged in at least the amount of at least $1 million, and NDL is entitled to punitive damages from defendant Bayard in the amount of at least $1 million.

## FIFTH CAUSE OF ACTION BY
## PLAINTIFF NDL AGAINST DEFENDANT BAYARD
### (Tortious Interference with Contract and Prospective Contractual Relations)

72.   Plaintiff NDL repeats and realleges each and every allegation contained in paragraphs 1 through 71 of this complaint.

73.   Upon information and belief, defendant Bayard was fully knowledgeable that NDL had established contractual and other business relationships with retail stores throughout southern New York, New Jersey, Eastern Pennsylvania and Connecticut, pursuant to which NDL sold Mercier products to such stores for resale to their retail customers.

74.   Upon information and belief, in pursuit of its goals of illegally and wrongfully maximizing its profits, and its goal of replacing NDL as the distributor within territories served by Mercier, defendant Bayard directly and indirectly, unfairly and maliciously interfered with NDL's business relationships with certain of these retail stores, among other things, soliciting those stores to cease dealing with NDL and to deal solely with Bayard for the purchase of Mercier products, by informing such stores that NDL would no longer be a distributor of Mercier's products and would no longer be able to supply such products.

75.   Upon information and belief, as a result of Bayard's unfair interference, certain such retail stores terminated their purchases of Mercier products from NDL.

76.   Consequently, plaintiff NDL has suffered, and is suffering, substantial economic injury, including lost sales, lost profits on those sales, the loss of the value of its investment in promoting defendant Mercier's products and in developing support capabilities for those products, and the loss of its investment in identifying stores willing to purchase the Mercier products.

77. As a result of the wrongful conduct of defendant Bayard, NDL has been damaged in at least the amount of at least $1 million, and NDL is entitled to punitive damages from defendant Bayard in the amount of at least $1 million.

### SIXTH CAUSE OF ACTION BY PLAINTIFF NDL AGAINST DEFENDNAT BAYARD
(Unjust Enrichment)

78. NDL repeats and realleges each and every allegation contained in paragraphs 1 through 77 of this complaint.

79. Upon information and belief, by conspiring with Mercier in order set minimum retail prices, and by illegally and wrongfully inducing Mercier and certain of the retail stores to do business with Bayard rather than plaintiff NDL, Bayard has undermined NDL's business and appropriated such business for itself.

80. As a result, defendant Bayard has been unjustly enriched as a result of its appropriation of NDL's investment in developing a network of retail stores which purchased Mercier products from NDL; NDL's investment in promoting defendant Mercier's products sold to those stores; and the profits NDL would have made on sales to such stores.

81. For these reasons, plaintiff NDL is entitled to a disgorgement of all profits obtained by Bayard as a result of such wrongful conduct.

### SEVENTH CAUSE OF ACTION BY PLAINTIFF NDL AGAINST DEFENDANT MERCIER
(Unjust Enrichment)

82. NDL repeats and realleges each and every allegation contained in paragraphs 1 through 81 of this complaint.

83. Mercier has been unjustly enriched by NDL's efforts and expenditures to develop the market for Mercier products and to promote the Mercier brand. NDL spent approximately

$100,000 on product displays, sales racks, and hand board displays, which NDL placed at numerous retail outlets. NDL also devoted thousands of hours of employee time to promote Mercier's products and to build up the Mercier brand.

84. NDL's expenditures and efforts to develop the market for Mercier products and to build up the Mercier brand was of great benefit to Mercier.

85. NDL was never compensated for developing the market for Mercier products and for building up the Mercier brand.

86. As a matter of equity and good conscience, the Court should enter judgment against Mercier for unjust enrichment in an amount to be determined by the Court.

**WHEREFORE,** plaintiff NDL prays for judgment:

(a) Awarding plaintiff NDL damages on the first cause of action against defendants in an amount to be proven at trial, but in no event less than one million dollars ($1,000,000.00), and that, in accordance with law, such amount be trebled;

(b) Awarding plaintiff NDL damages on the second cause of action against defendants in an amount to be proven at trial, but in no event less than one million dollars ($1,000,000.00), and that, in accordance with law, such amount be trebled;

(c) Awarding plaintiff NDL damages on the third cause of action against defendants in an amount to be proven at trial, but in no event less than one million dollars ($1,000,000.00), and that, in accordance with law, such amount be trebled;

(d) Awarding plaintiff NDL damages on the fourth cause of action against defendant Bayard in an amount to be proven at trial, but in no event less than one million dollars ($1,000,000.00), and that, in accordance with law, such amount be trebled;

...

(e) Awarding plaintiff NDL damages on the fifth cause of action against defendant Bayard in an amount to be proven at trial, but in no event less than one million dollars ($1,000,000.00), and that, in accordance with law, such amount be trebled;

(f) Awarding plaintiff NDL on the sixth cause of action a disgorgement of profits wrongfully obtained by defendant Bayard as a result of its conduct as alleged herein;

(g) Awarding plaintiff NDL on the seventh cause of action damages against Mercier in an amount to be determined by the court for unjust enrichment.

(h) Due to the willful and wanton nature of defendants' conduct and the need to deter same to prevent public harm and injury, awarding plaintiff NDL demands punitive damages in the amount of one million dollars ($1,000,000.00).

(i) Awarding plaintiff NDL the costs of this suit, including reasonable attorney's fees, as provided by law, and

(j) Awarding plaintiff NDL such other, further and different relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff NDL hereby demands a trial by jury of all issues so triable.

Dated: New York, New York
April 18, 2007

JAFFE & ASHER LLP

By: *Ira N. Glauber* (signature)
Ira N. Glauber (ING 8383)
Gregory E. Galterio (GG 0787)
Mark H. Moore (MM 8604)
600 Third Avenue, 9th Floor
New York, New York 10016
(212) 687-3000

Attorneys for Plaintiff Norman D. Lifton Company, Inc.